Robert ROZEK and Hazel Rozek, Appellants (Plaintiffs Below),

v.

AMERICAN FAMILY MUTUAL INSUR-ANCE COMPANY, Appellee (Defendant Below).

No. 49A02–8606–CV–224.

Court of Appeals of Indiana, Second District.

Sept. 2, 1987.

general finding, if any, shall control as to the other issues or matters which are not covered by such findings."

Gary L. Miller, Hollingsworth Meek & Miller, P.C., Indianapolis, for appellants.

Joseph M. Dietz, Meils Zink Thompson Dietz & Bola, Indianapolis, for appellee.

SULLIVAN, Judge.

On July 1, 1971, Hazel Rozek obtained a "Comprehensive Family Hospital, Surgical & Medical Expense Policy" from American Family Mutual Insurance Company. The policy was designed to pay eighty percent of the first $500 in eligible medical expenses and all the remaining eligible medical expenses, to a $10,000 maximum. "Eligible medical expenses" included, *inter alia,* "surgical procedures performed by a physician...." Record at 6.

On the insurance application, Rozek responded affirmatively to the question, "Have you ... been treated for or ever had any known indication of chest pain, palpitation [or] high blood pressure? ..." Record at 11. She explained that she had high blood pressure; that it was a current condition; that the condition was "normal;" and that she took medication for the problem. As a result of this disclosure, the policy included an exclusionary waiver provision. Part of the provision was preprinted upon the form and part of the provision was added by typewriter. The entire provision is as follows:

> "WAIVER—This policy does not cover anything of which the following is the sole, primary, or secondary cause, anything in the policy to the contrary notwithstanding:
>
> 'TREATMENT OF HAZEL FOR HYPERTENSION, ITS UNDERLYING CAUSES, AND ITS COMPLICATION.' " Record at 15.

Throughout the 1970's, Rozek's blood pressure was controlled through medication. In 1981, her blood pressure increased and was much more difficult to control, prompting her doctor, Gilbert Barnes, to change medications. Dr. Barnes found that Rozek's sodium level was roughly normal, but that her potassium level was low. This indicated, he believed, a hormonal problem as a factor causing high blood pressure.

In January, 1983, Rozek was referred to Dr. Rashid Khairi, an endocrinologist, because of the apparent glandular condition. Dr. Khairi treated the low potassium level with an injection, and, despite the fact that they are "very rare," tested for an adrenal gland tumor. The tests confirmed his diagnosis. Rozek's tumorous left adrenal gland was successfully, surgically removed on May 2, 1983.

According to Drs. Khairi and Barnes, the adrenal glands produce a hormone called aldosterone which controls "salt and water metabolism" in the body. The tumor, the cause of which is unknown, caused hyperaldosteronism, which is excessive secretion of the hormone aldosterone. *See Stedman's Medical Dictionary,* 40 (4th Lawyer's Ed., 1976). Excessive aldosterone causes potassium depletion and sodium retention, which in turn causes increased

blood volume and pressure. The amount of hormone secretion caused by the tumor, more than tumor size, is key to the problem's severity.

There is a theoretical possibility that the tumor existed at policy inception, 1971. Dr. Khairi stated that the only evidence, which he termed "indirect," of when the tumor started, was a low potassium level. Hypertension (high blood pressure) did not cause the tumor, nor was the . tumor a complication of the hypertension. Though the tumor was diagnosed as benign, it was the sole cause of Rozek's then current hypertension, Dr. Khairi believed, based on her response to therapy. Dr. Barnes was to some degree unsure of whether the tumor was the sole cause of the hypertension because of his prior diagnosis that emotional factors were causing the hypertension.

Rozek filed a claim for the cost of the surgery. American Family denied the claim. Rozek sued, seeking the policy limit; American Family counterclaimed for declaratory relief. After some discovery, including the two doctors' depositions, American Family moved for summary judgment. The trial court granted the motion. Rozek appeals.

We reverse.

■ As in most summary judgment cases, our immediate focus is upon the standard for summary judgment. Summary judgment may be granted only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law of law. Indiana Rules of Procedure, Trial Rule 56(C). Factual materiality is defined functionally: does it aid in proving or disproving an essential element of a claim or an affirmative defense? *See Delk v. Board of Commissioners of Delaware County* (1987) 2d Dist.Ind.App., 503 N.E.2d 436, 439. Even if there is no core factual issue, summary judgment is nevertheless inappropriate. if one may draw conflicting inferences from the undisputed facts. Also, it is necessary for the moving party to show the absence of any genuine issue of material fact, and all doubts and inferences are resolved against the moving party. *Powell v. Daw-*

son (1984) 2d Dist. Ind.App., 469 N.E.2d 1179, 1181. The non-moving party is entitled to a liberal construction of all pleadings, affidavits and testimony. *Bell v. Northside Finance Corp.* (1983) Ind., 452 N.E.2d 951, 953. Questions of evidentiary weight, or credibility, should not be resolved via summary judgment. *Id.* In short, summary judgment does not and should not perform the function of an abbreviated trial. *See Kahf v. Charleston South Apartments* (1984) 2d Dist. Ind. App., 461 N.E.2d 723, 729.

That this litany has become ritual does not detract from the vital concerns which motivate it. While recognizing its efficiencies, one must remain cognizant of summary judgment's impact on the losing party. As noted recently in *Joseph v. Calvary Baptist Church* (1986) 4th Dist. Ind.App., 500 N.E.2d 250, 253, *trans. pending,* "A motion for summary judgment is not to be granted lightly, since the granting of the motion cuts off the right of the losing party to fully litigate the claim." Terminating by summary disposition those cases which need no factual resolution, or which are spurious, is laudable. Terminating by summary disposition those cases which present merely an unlikelihood of ultimate success is impermissible. *McNabb v. Mason* (1970) 148 Ind.App. 233, 264 N.E.2d 623.

■ Here, the policy dispute centers upon the exclusionary clause. Exclusionary clauses limit or restrict obligations undertaken in the insuring clause. *Indiana Insurance Co. v. DeZutti* (1980) Ind., 408 N.E.2d 1275. Generally, a coverage exclusion is an affirmative defense, proof of which is the insurer's burden. *Zebrowski & Associates v. City of Indianapolis* (1983) 1st Dist. Ind.App., 457 N.E.2d 259, 262. Our task in reviewing insurance provisions is clear. As stated in *State Security Insurance Co. v. Ottinger* (1985) 2d Dist. Ind.App., 487 N.E.2d 446, 447:

"Interpretation and construction of insurance policy provisions is a function for the courts, at trial and appeal. Therefore, our standard of review on the interpretation aspect of the issue is es-

sentially the same as that employed by the trial court. As a general rule insurance policies are subject to the same rules of interpretation as are other contracts. (Citation omitted.) Hence, if the policy language is clear and unambiguous, absent a provision contrary to public policy, the policy language should be given its plain and ordinary meaning."

At the outset, we note that attempts to reconcile the exclusion's typed and printed portions have proved unrewarding in the effort to give the language a plain and ordinary meaning.

Beyond syntactical difficulties, the clause's typed and printed portions are logically irreconcilable because of their breadth of exclusion. Standing alone, the typed portion seeks to exclude both causes *and* complications. The printed portion, in the abstract, seeks only to exclude complications of the hypertension. In short, the two provisions are simply inconsistent.

American Family seeks to avoid coverage on the grounds that the tumor was an "underlying cause" of the hypertension and thus excluded by the clear intent of the typed portion. Rozek's tumor may have been latent for some time, and it may or may not have been a fundamental or basic cause of hypertension throughout the 1970's. The two doctors' deposition testimony is inconclusive on this point. More importantly, the record does not reflect whether the tumor was a medical condition requiring corrective treatment, independent of the manner in which it may have affected Rozek's hypertension.

Our determination must be made in light of our construction of the exclusion: although treatment for a discoverable, manifest or active, fundamental cause of the hypertension is excluded under the policy provisions, a condition which warrants independent corrective treatment, without regard to its effect on a possibly pre-existing hypertension condition, is not excluded. This construction results from a recognition that, while the policy's language cannot be eviscerated, *see Evans v. National Life Accident Insurance Co.* (1984) 2d Dist. Ind.App., 467 N.E.2d 1216, 1219, it

must be reconciled with two well-established Indiana principles of insurance contract construction.

The first of these principles begins with the longstanding definition of "cause" used in construing insurance policies which speak to "cause." In *Nationwide Mutual Insurance Co. v. Neville* (1982) 1st Dist. Ind.App., 434 N.E.2d 585, the court upheld the giving of an instruction that "cause" in the policy meant "proximate cause" despite the policy's language which defined "injury" as " '. . . loss resulting directly and independently, of all other causes, from an accident.' " *Id.* at 590. The court noted that Indiana does not follow the rule that a causative or contributory pre-existing medical condition necessarily bars coverage for an injury. Quoting *Continental Casualty Co. v. Lloyd* (1905) 165 Ind. 52, 60, 73 N.E. 824, 826, the court concluded:

> " 'When two or more causes contribute to an injury, where there is doubt, or the facts of such a character that equally prudent persons would draw different conclusions therefrom, in such cases, which of the contributing causes is the efficient, dominant, proximate cause is a question to be submitted to the jury. (Citations omitted.)' " *Neville, supra,* 434 N.E.2d at 591.

In *American States Insurance Co. v. Morrow* (1980) 1st Dist. Ind.App., 409 N.E.2d 1140, the court discussed the proximate cause formulation in the pre-existing condition context, and similarly concluded that the condition should not be held to necessarily bar coverage under the proximate cause standard. The court reasoned, "To require a person to be in perfect health at the time of the accident would be an absurdity, rendering the policy virtually worthless." *Id.* at 1142.

Nothing before us indicates that the adrenalectomy was prompted by a necessity for treating the problem which the insurer did properly exclude, hypertension. This conclusion, that the surgery was apparently an independent necessity, is buttressed by the fact that it was *a tumor*, though benign, which was removed.

The second pertinent principle concerns pre-existing conditions which are excluded by a clause excepting conditions existing prior to policy inception. In construing these clauses, the general rule is,

"[T]hat for a disease or illness to 'exist' in a health insurance policy sense, it must have become manifest or active or there must be some *distinct* symptom or condition from which a physician can make an accurate diagnosis of the disease." *Mutual Hospital Insurance, Inc. v. Klapper* (1972) 2d Dist., 153 Ind. App. 555, 560, 288 N.E.2d 279, 283 (emphasis supplied), *trans. denied* (1974) 262 Ind. 144, 312 N.E.2d 482 (equally divided court).

The degree to which a condition has manifested itself, is active, or could have been correctly diagnosed is an important factual determination, and precludes liberal use of summary judgment. *See American Family Insurance Group v. Blake* (1982) 1st Dist. Ind.App., 439 N.E.2d 1170 (whether illness, originally diagnosed as symptomatically similar illness, manifested itself during policy exclusion period was a factual issue for trial).

Again, the rationale which prompts the manifestation-or-diagnosis approach compels a similar result here. The rule is designed to protect insurers from applicants seeking to defraud (based on knowledge of a pre-existing condition), while protecting the insured. As the *Klapper* court stated, "[T]o consider a disease to exist at a time when the victim is blissfully unaware of the medical 'seeds' visited upon his body is to set a trap for the unwary purchaser of health insurance policies." *Klapper, supra,* 153 Ind.App. at 560, 288 N.E.2d at 283. Here, to give the exclusion the effect of denying coverage for the adrenalectomy would run contra to *Klapper*'s principles.

This policy exclusion must be limited and construed as noted: a discoverable, manifest or active, fundamental or basic cause of the hypertension is excludable under the policy, but a condition warranting independent corrective treatment is not. American Family bore the burden of showing that the policy exclusion issue was one without a genuine issue of material fact and entitling it to judgment as a matter of law. Under this construction, American Family has not discharged that burden.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

BUCHANAN and NEAL, JJ., concur.